# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| RICHARD FORMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 2018-0287-JRS** |
| | : | |
| CENTRIFYHEALTH, INC. d/b/a | : | |
| CentriHealth, CENTRIFYHEALTH, | : | |
| LLC, UNITEDHEALTH GROUP | : | |
| INCORPORATED, DR. RALPH | : | |
| KORPMAN, STEVEN MCLEAN, | : | |
| PETER TONG, JERE CHRISPENS, | : | |
| and BRIAN BULL, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: January 15, 2019
Date Decided: April 25, 2019

Michael A. Weidinger, Esquire and Joanne P. Pinckney, Esquire of Pinckney, Weidinger, Urban & Joyce LLC, Wilmington, Delaware, Attorneys for Plaintiff.

William M. Lafferty, Esquire, Susan W. Waesco, Esquire and Sabrina M. Hendershot, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Bruce C. Doeg, Esquire, John S. Hicks, Esquire and Christopher E. Thorsen, Esquire of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, Tennessee, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

As a court of equity, this court holds parties seeking equity to certain "maxims" that guide the court's exercise of equitable discretion.[1] Perhaps the most tested of these is the maxim that "equity favors the vigilant, not those who slumber on their rights."[2] We require parties seeking equity to abide by this maxim for good reason. "[T]he law wisely holds that there shall come a time when even the wrongful possessor shall have peace, and that it is better that ancient wrongs should go unaddressed than that ancient strife should be renewed."[3]

Laches has evolved from its basic command that a plaintiff act with vigilance. We now frequently consider laches against the backdrop of analogous statutes of limitations.[4] And, in certain instances, we consider a multi-factor test to determine whether "unusual conditions or extraordinary circumstances" exist that would justify allowing a claim to proceed without regard to the analogous statute of limitations.[5]

---

[1] *See* Howard W. Brill, *The Maxims of Equity*, 1993 ARK. L. NOTES 29 (1993) (observing that the "maxims of equity" are "not traceable to a single author or Author," lack the "precision and clarity" of statutes and yet, "if nothing else," have come to "offer an insight into [the exercise of] equitable discretion").

[2] 2 JOHN NORTON POMEROY, POMEROY'S EQUITY JURISPRUDENCE § 418 (5th ed. 2002); *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009).

[3] *Norfleet v. Hampson*, 209 S.W. 651, 654 (Ark. 1919).

[4] *See, e.g.*, *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016) (holding that "a presumption of laches arises in certain contexts when a plaintiff brings a claim outside of a relevant statute of limitations period").

[5] *See IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 178 (Del. 2011).

These refinements to the laches analysis are not only precedential, they are useful guideposts as the court assesses whether a claim should be barred as untimely. But, at bottom, the maxim from which laches derives reveals the proper focus of the inquiry: has the claimant exercised "vigilance" in bringing his claims?

Plaintiff, Richard Forman, brings this breach of contract, breach of fiduciary duty and fraud action against Defendants, CentrifyHealth, Inc. d/b/a CentriHealth and CentrifyHealth, LLC (collectively, "CentriHealth" or the "Company"), UnitedHealth Group Incorporated ("UHGI"), Dr. Ralph Korpman, Steven McLean, Peter Tong, Jere Crispens and Brian Bull (collectively, the "Individual Defendants") relating to events that occurred more than a decade before he filed his complaint. The gravamen of his claims is that Korpman, as founder of CentriHealth, twice promised him equity in the Company but has since reneged on the promises. Specifically, Forman alleges that Korpman promised him so-called "Founder's Shares" in 2005 (equivalent to a 1% stake in the Company) as a means to induce Forman to join the CentriHealth board of directors (the "Board"), and then promised him stock options after the Company adopted a stock option plan in 2006 (the "Forman Options").

As for the Founder's Shares, Forman acknowledges in his complaint that he began pressing Korpman to acknowledge the promise to issue Founder's Shares as early as 2007 but never received the shares. During exchanges between Forman and

2

Korpman that Forman sporadically initiated over the course of eleven years, a pattern emerged. Forman would ask for confirmation that he owned Founder's shares; Korpman would either duck the question entirely or answer it by providing Company capitalization tables that clearly revealed the Company did not acknowledge that Forman ever held Founder's Shares; Forman would then do nothing until he repeated the inquiry, sometimes years later, only to receive the same or similar response. Indeed, as the operative complaint makes clear, in all of this time, neither Korpman nor the Company ever gave Forman the answer he was looking for—they never once told him that the Company recognized him as an owner of Founder's Shares.

As for the Forman Options, Forman was a member of the Board that approved the Company's stock option plan in 2006 and knew he was a beneficiary of the plan, but he never received a copy of the plan and never asked to see it. Forman resigned from the Board in 2010. Defendants maintain that, in doing so, Forman terminated his right to participate in the plan according to its plain terms. Forman alleges that Korpman assured him he would remain eligible to participate in the plan even if he resigned from the Board and argues that Defendants may not invoke the terms of the plan to deny him his options when they never gave him (or the other beneficiaries) a copy of the plan.

3

The feathers hit the fan in August 2017, when CentriHealth's shareholders approved a merger of the Company with UHGI. Forman again asserted his claim to Founder's Shares and the Forman Options. And, again, the Company promptly denied that Forman had a right to either. He filed his complaint in this Court eight months later, on April 17, 2018.

The laches analysis is often "fact-intensive."[6] Even so, a defendant may invoke the defense at the pleadings stage if "the complaint itself alleges facts that show that the complaint is filed too late."[7]

The first antonym listed for "vigilant" in Thesaurus.com is "careless."[8] In pursuing his claim for Founder's Shares, Forman was exactly that—careless. He asserted his claim for Founder's Shares with the Company as early as 2007 and then periodically reasserted the claim in the several years that followed before he filed his complaint in 2018. Nevertheless, in all those years, Forman never achieved satisfaction. According to the complaint, Korpman repeatedly evaded Forman's inquiries, neither expressly acknowledging nor expressly denying that Forman held Founder's Shares. The capitalization tables Korpman regularly provided to Forman,

---

[6] *Buerger v. Apfel*, 2012 WL 893163, at *2 (Del. Ch. March 15, 2012).

[7] *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993).

[8] *See* Vigilant, Thesaurus.com, https://www.thesaurus.com/browse/vigilant (last visited April 22, 2019).

however, were not so cryptic. They revealed without question that the Company did not recognize Forman's claim to Founder's Shares. Yet Forman did nothing to advance his claim in the face of these serial denials—nothing in 2007,[9] nothing in 2010,[10] and nothing in 2013.[11] Forman's delay in prosecuting his claims relating to the Founder's Shares, first asserted in any court in April 2018, is unreasonable. The delay has caused prejudice. Consequently, the claims are barred by laches and must be dismissed.

The laches analysis with respect to Forman's claim for the Forman Options is not so straightforward. While the act that triggered Forman's alleged forfeiture of the Forman Options—his resignation from the CentriHealth Board—occurred in 2010, it is alleged that Korpman regularly assured Forman that he continued to hold the Forman Options both before and well beyond his resignation. While Forman arguably was not vigilant in his failure to request a copy of CentriHealth's stock option plan at any time after its adoption, he has alleged that the plan was not reduced to writing, as required by the DGCL,[12] and that the written version of the plan that has now been supplied to him is not reflective of the terms the Board approved

---

[9] First Amended Complaint ("FAC") (D.I. 12) ¶¶ 31–33.

[10] FAC ¶¶ 34, 39–40, 42.

[11] FAC ¶ 45.

[12] 8 *Del. C.* § 157(b).

in 2006. He also alleges that he relied upon Korpman's misrepresentations regarding the plan by not exercising the Forman Options prior to his resignation. As explained below, these allegations allow a reasonable inference that Forman did exercise vigilance in pursuing at least some of his claims relating to the Forman Options (those that rest upon Korpman's alleged misrepresentations). The motion to dismiss those claims for laches, therefore, must be denied.

## I. BACKGROUND

I have drawn the facts from the Amended Complaint and the 27 exhibits attached to the Amended Complaint. In resolving the motion to dismiss, I accept as true the Amended Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[13]

### A. The Parties

Plaintiff, Forman, is a former director and stockholder of Defendant, CentriHealth, a Delaware corporation specializing in "health informatics."[14] At all relevant times, Defendant, Korpman, was CentriHealth's founder and controlling stockholder and served as chairman of the Board.[15] Defendants, Steven McLean,

---

[13] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[14] FAC ¶¶ 1, 2, 7, 10; Ex. 2.

[15] FAC ¶ 10.

Peter Tong, Jere Chrispens and Brian Bull, served as members of CentriHealth's Board until the Company merged with UHGI in August 2017.[16]

**B. Forman Negotiates For Equity in CentriHealth**

In May 2005, Korpman approached Forman to gauge his interest in joining the board of Korpman's start-up company, UnifyHealth (later renamed CentriHealth).[17] Korpman respected Forman and valued his business acumen. Forman was intrigued by Korpman's plan for the Company but wanted to ensure that his role in guiding the Company beyond start-up would be compensated by a grant of significant equity.[18] To this end, Forman proposed that he would help with "structuring the opportunity and mapping out a business growth plan, including the raising of additional capital" in exchange for "a stake of 5% of the Company prior to any financing."[19] Korpman countered on May 9, 2005 with an offer of 1% equity, to increase up to 5% over the next 60–90 days.[20] Forman agreed.[21]

---

[16] FAC ¶¶ 5, 11.

[17] FAC ¶¶ 1, 12.

[18] FAC ¶¶ 12–18.

[19] FAC ¶¶ 13, 14; Ex. 3.

[20] FAC ¶ 15; Ex. 3.

[21] FAC ¶ 16; Ex. 3.

On May 18, 2005, Korpman sent Forman a proposed letter agreement memorializing the deal, which Forman then forwarded to an attorney.[22] Forman sent his attorney's comments to Korpman later that day, and requested a capitalization table and clarification concerning whether the shares would be "founder's shares."[23] Korpman confirmed that Forman's equity would be "founder's shares, including the remaining four percent, which will be held at formation (as founder's shares) for later disposition as we have agreed."[24]

On June 17, 2005, Forman returned to Korpman a signed version of the letter agreement and a pro forma capitalization table reflecting Forman's equity position.[25] The table provided for "Initial Stock," of which Forman held 1.00%, and "Founder's Stock," of which Forman, and four others, held 10.00%.[26] Forman made handwritten edits to the letter and capitalization table, clarifying that he had not committed to invest in the Company and that his role would be as a "Board Member and/or investor."[27] Korpman said this change was "fine" but did express surprise at

---

[22] FAC ¶ 19; Ex. 5.

[23] FAC ¶ 20; Ex. 5.

[24] *Id.*

[25] FAC ¶¶ 21, 24; Ex. 1.

[26] Ex. 1. It was not clear from the Amended Complaint how or when the agreement with respect to Forman's equity changed from the initial May 9, 2005 proposal.

[27] FAC ¶ 23; Ex. 1.

Forman's reluctance to commit as an investor particularly given that the other directors were investing $1 million for 10% equity.[28] Nevertheless, Korpman agreed with Forman that the question of his investment was separate from the "original deal."[29] According to Forman, this exchange with Korpman memorialized Forman's initial equity interest and Korpman's acceptance of Forman's changes to the agreement.[30]

On February 12, 2006, members of the Board, including Forman, approved the CentrifyHealth 2006 Stock Option Plan under which Forman received 5,000 of the Forman Options.[31] Forman alleges that he "expected the Option Plan to be made promptly available for review in connection with the resolution adopting the plan, but it was not."[32]

---

[28] Ex. 6.

[29] FAC ¶ 25; Ex. 6.

[30] FAC ¶¶ 21, 21 n.7.

[31] FAC ¶ 29; Exs. 9, 17. Plaintiff does not allege when he received the remaining 3,000 of his 8,000 Forman Options, but it appears they were to vest on August 23, 2011, four years after their issue date. Ex. 20.

[32] FAC ¶¶ 29, 37. At the time they approved the option plan, the Board also authorized the sale of Series B Preferred stock, of which Forman acquired 10,000 shares. *Id*. Forman had also acquired Series A Preferred shares a year earlier. FAC ¶ 28. The Series A and B Preferred shares are not at issue in this litigation. FAC ¶ 55.

## C. The Disputed Status of the Founder's Shares and Forman Options

In May 2007, Forman initiated the first of many overtures that would occur during the next six years in which he sought Korpman's assurance that the Company recognized his Founder's Shares. On May 10, 2007, Forman asked Korpman for a copy of the Company's current capitalization table.[33] Korpman sent Forman a capitalization report dated December 31, 2006.[34] This report reflected that Forman held preferred and common stock but made no reference to the Founder's Shares.[35] The following morning, Forman pointed out the missing Founder's Shares and reminded Korpman of their letter agreement.[36] Korpman responded,

> As I think we discussed long ago, you got 5,000 option shares in the beginning of time in exchange for your help . . . . Only one other board member (Peter) has options (similar in number as I recall) for similar early assistance, etc. All other options are to employees.[37]

Two days after this exchange, Forman followed up with Korpman: "BTW, I'm assuming we are set on the initial stock allocation of 10,000 shares awarded

---

[33] FAC ¶ 31; Ex. 10.

[34] *Id.*

[35] *Id.*; Exs. 7, 11. Defendants point out that it is not clear whether the capitalization table attached to the Complaint as Ex. 7 is the same one Forman received in May 2007. For now, I accept as true Forman's allegation that Ex. 7 is the capitalization table he received from the Company in response to his May 2007 inquiry.

[36] FAC ¶ 31; Ex. 11.

[37] *Id.*

on 6/16/05."[38]   Korpman answered, "I don't recall exactly why I did what I did. I'm sure I had a good rationale at the time.  But we'll make it good regardless."[39]

Five days later, on May 22, 2007, Forman inquired about certificates for the Founder's Shares.[40]  As would become his custom, Korpman ignored the request. Instead, he answered a question that was not asked by providing an explanation of how Forman could "transfer the name of the founder's shares."[41]  Forman clarified in his response that he had never received stock certificates for the shares.[42] Apparently still under the impression that Forman's Founder's Shares had been replaced by stock options, Korpman asked, "[a]re you talking about the 5K options going to 10K options?  OK, I thought you meant the reassignment of the first round shares you bought to an affiliated entity.  The option shares have no paperwork at the moment (they're just on the books of the company) . . . ."[43]  Forman responded later that day, reminding Korpman, "[o]ur agreement was for founder's shares, not

---

[38] Ex. 11.

[39] FAC ¶ 31; Ex. 11.

[40] FAC ¶ 32; Ex. 12.

[41] FAC ¶ 32; Ex. 12.

[42] *Id*.

[43] *Id*.

options.  As you know, there's a big tax difference . . . ."[44]  Still not connecting, Korpman invited Forman to call to discuss the matter further, but it does not appear that Forman accepted the invitation.[45]

Two months later, Forman again asked Korpman to provide his "share documentation."[46]  Korpman ignored Forman's request until a Board retreat one month later at the end of August 2007.[47]  After the retreat, Forman sent Korpman the initial letter agreement and asked him, yet again, to resolve the "founder's equity issue."[48]  Korpman, yet again, ignored him.

Over two years passed before Forman reached out to Korpman again to discuss his ownership interest in CentriHealth.  In April 2010, Forman asked Korpman whether he could transfer his "Centrihealth securities" to his ex-wife.[49]  Korpman did not respond until July 14, 2010, when he provided an explanation of how to transfer Forman's Series A and B Preferred stock (not Founder's Shares).[50]

---

[44] *Id.*

[45] *Id.*

[46] FAC ¶ 33; Ex. 13.

[47] *Id.*

[48] FAC ¶ 33; Ex. 14.

[49] FAC ¶ 34; Ex. 15.

[50] FAC ¶ 34; Ex. 16.

In the correspondence that followed, Korpman added, "[t]he options have not been exercised and the shares are not issued; the options are not transferrable, since they are for particular services rendered rather than for a fungible contribution. . . . The goal is to make people stay to the bitter end of the company . . . ."[51]

On July 16, 2010, Korpman confirmed that Forman held 8,000 shares of non-transferrable options intended to vest ratably over four years from the issue date or fully upon a liquidity event.[52] Forman then asked Korpman, "are these vested? If I resign from the board, do I lose all/some/none?"[53] Korpman replied by email, "I believe we went over this when we spoke on the phone . . . ."[54] He went on to explain only vesting details; he did not respond to Forman's inquiry regarding whether the options would terminate upon resignation.[55] According to Forman, during the phone call referred to in Korpman's email, Korpman assured Forman that if he left the Board, he would not lose his options.[56] Thus, in response to Korpman's

---

[51] Ex. 16.

[52] *Id.*

[53] *Id.*

[54] FAC ¶ 40; Ex. 16.

[55] *Id.*

[56] *Id.*

reference to their earlier telephone conversation, Forman wrote back, "[y]es. My apologies."[57]

## D. Forman Resigns from the Board

Forman resigned from the Board on August 31, 2010, citing "concerns about the lack of corporate governance at the Company."[58]  Shortly after resigning, on September 13, 2010, Forman asked Korpman for information on the vesting of the Forman Options.[59]  In response, Korpman informed Forman that 5,000 of his options vested in February 2010 and the remaining 3,000 were to vest on August 23, 2011, with an expiration date ten years from issue.[60]

Three years later, on February 13, 2013, Forman again asked Korpman to confirm Forman's ownership position in the Company and to supply him with a copy of the capitalization table.[61]  Korpman advised Forman that he owned 32,500 Preferred A shares and 8,000 options.[62]  Once again, he made no reference to Founder's Shares.

---

[57] *Id.*

[58] FAC ¶ 42; Ex. 19.

[59] FAC ¶ 43; Ex. 20.

[60] *Id.*

[61] FAC ¶ 45; Ex. 21.

[62] *Id.*

Roughly two and a half years later, at the end of May 2015, Forman emailed Korpman to request information about how to exercise his Forman Options.[63] That same day, Forman directed a similar inquiry to then-Board member Steven McLean, who replied that he would ask Korpman about the redemption process and "[k]eep [Forman] up to date."[64] Korpman did not respond to Forman until August 12, 2015, when he requested a meeting with Forman.[65] The Amended Complaint does not indicate whether that meeting happened. As for McLean, it is alleged that he never answered Forman's inquiry.[66] The trail, at least in 2015, ends there.

**E. The Company Rejects Forman's Claims Following the UHGI Merger**

In May 2017, almost two years after their last email exchange, Forman once again requested that Korpman confirm his ownership interest in the Company.[67] Korpman reiterated that Forman held 32,500 Series A Preferred shares and 6,500 Series B Preferred shares. As for the Founder's Shares and Forman Options, Korpman stated that he would have to check with "the person who tracks these things" before he could respond to Forman's statement that he held "8,000 shares of

---

[63] FAC ¶ 46; Ex. 22.

[64] FAC ¶ 46; Ex. 23.

[65] *Id.*

[66] *Id.*

[67] FAC ¶ 47; Ex. 24.

fully vested and exercisable options and 20,000 initial shares based on the initial capitalization of the Company."[68]

Consistent with the pattern that began almost immediately after Forman joined the Board, Korpman dawdled over the next month and managed to provide no meaningful responses to Forman's inquiries.[69] Finally, on July 14, 2017, Forman received a letter from a Company lawyer stating that Forman did not own any "initial equity" and had forfeited his options upon his resignation from the Board.[70] The letter attached a portion of the option plan for Forman's review.[71] According to Forman, this was the first time he had seen a copy of the plan.[72] An attorney for Forman responded to the letter on June 21, 2017, attaching the 2005 letter agreement and correspondence between Forman and Korpman concerning their initial negotiations of the Founder's Shares.[73] The letter explained the bases for Forman's

---

[68] *Id.*

[69] FAC ¶¶ 47–51; Exs. 24–27.

[70] FAC ¶ 52; Ex. 27 (letter from John Devine on behalf of Forman to Bruce Doeg dated July 21, 2017, describing and responding to Doeg's July 14, 2017 letter).

[71] Ex. 27.

[72] Exs. 17, 27; FAC ¶¶ 35–37. Forman alleges that the version of the 2006 option plan provided to him in 2017 was created after the grant of the Forman Options and was modified in an unknown and undisclosed respect as indicated by the internal document footer reflecting a date of "12/01/2015" and describing the document as "v2." FAC ¶ 36; Ex. 17.

[73] Ex. 27.

claim to the Founder's Shares and Forman Options and requested documentation regarding Forman's rights as a stockholder of the Company.[74]

Forman alleges it was through this exchange of correspondence between the attorneys that he first learned of the CentriHealth/UHGI merger.[75] After a request from his lawyers, Forman received the shareholder package related to the merger on August 12, 2017, one week after a majority of the stockholders approved the transaction.[76]

## F. Procedural Posture

Forman filed his Verified Complaint on April 17, 2018. After Defendants moved to dismiss, Forman filed his Amended Complaint on August 1, 2018. The Amended Complaint sets forth nine counts and separates claims relating to the Founder's Shares from claims relating to the Forman Options. As related to the Founder's Shares, Forman asserts claims for breach of contract (Count I), promissory estoppel (Count III), unjust enrichment/constructive trust (Count VI), breach of fiduciary duty (Count VII), equitable fraud (Count VIII) and conversion (Count IX). As related to the Forman Options, Forman asserts claims for breach of contract (Count II), promissory estoppel (Count III), misrepresentation/fraud

---

[74] *Id.*

[75] FAC ¶ 53.

[76] FAC ¶ 53; Ex. 2.

(Count IV), breach of fiduciary duty (Count V), unjust enrichment/constructive trust (Count VI) and equitable fraud (Count VIII). Forman seeks both legal and equitable relief, including an order compelling UHGI to pay Plaintiff the merger consideration that other initial equity and option holders received, the value of the Founder's Shares and Forman Options, a constructive trust and damages. He also requests attorneys' fees and fee shifting for Defendants' alleged bad faith conduct.

Defendants moved to dismiss the Amended Complaint on August 22, 2018.[77] Their showcase argument is that all of Forman's claims are barred by laches. Alternatively, Defendants attack Counts II, IV, VI and VIII on their merits.

## II. ANALYSIS

My analysis of the motion to dismiss the claims related to the Founder's Shares begins and ends with laches. Because I conclude it is clear on the face of the Amended Complaint that Forman was at least on inquiry notice of those claims and injuries but unreasonably delayed in pursuing them to the prejudice of the Defendants, I dismiss the claims for laches and decline to reach Defendants' merits-related arguments with respect to those claims.

Similarly, it is clear from the Amended Complaint that Forman was on actual notice of Defendants' failure to provide him with a copy of the option plan as of the

---

[77] D.I. 13.

18

date he and the other Board members approved the plan in 2006. Thus, to the extent Forman purports to state claims against the Defendants for failing to provide him with a copy of the option plan, I find he unreasonably delayed in pursuing those claims to the prejudice of the Defendants.

As for Forman's claim that he is entitled to the Forman Options even though he resigned from the Board, either under the terms of the plan approved by the Board (as opposed to the copy of the plan supplied to him following the UHGI merger) or as promised to him by Korpman, as explained below, there are factual issues that must be resolved before the Court can undertake a proper laches analysis. As for the merits of these claims, I am satisfied they are well-pled and, therefore, survive the motion to dismiss.

## A. Standard of Review

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts as pled in the complaint.[78] In considering a motion to dismiss, the court must accept as true all well-pled

---

[78] *Gen. Motors*, 897 A.2d at 168.

allegations in the complaint and draw all reasonable inferences from those facts in Plaintiff's favor.[79]

## B. Laches

Laches is an equitable doctrine grounded in the rationale that "upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief."[80]  A successful laches defense generally requires proof of (1) plaintiff's knowledge of the invasion of his rights; (2) unreasonable delay in bringing suit to vindicate those rights, and (3) resulting prejudice to the defendant.[81]

In proving the first prong of a laches defense, Defendants must demonstrate that Forman was on inquiry notice, if not actual notice, of his claims.[82]  A plaintiff is on inquiry notice of a claim when he "becomes aware of facts sufficient to put a

---

[79] *Id.*

[80] *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978).

[81] *See Akrout v. Jarkoy*, 2018 WL 3361401, at *8 (Del. Ch. July 10, 2018).  *See also Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *7 (Del. Ch. Mar. 22, 2004), *aff'd*, 888 A.2d 204 (Del. 2005).

[82] *See Baier v. Upper New York Inv. Co. LLC*, 2018 WL 1791996, at *11 (Del. Ch. Apr. 16, 2018).

person of ordinary intelligence and prudence on inquiry which, if pursued, could lead to the discovery of the injury."[83]

To determine whether a plaintiff unreasonably delayed in bringing his claims after he became aware of them, this court often turns to the analogous statute of limitations as a presumptive marker for timeliness.[84]  Where, as here, a plaintiff brings equitable claims seeking legal relief and legal claims seeking equitable relief, the court may apply the analogous limitation period with "perhaps more presumptive force given its quasi-legal status . . . ."[85]  Under Title 10, Section 8106 of the Delaware Code, the analogous limitations period for each of Plaintiff's claims is three years.[86]  "[A] cause of action 'accrues' under Section 8106 at the time of the

---

[83] *Whittington v. Dragon Gp. L.L.C.*, 2009 WL 1743640, at *9 (Del. Ch. June 11, 2009) (quotation omitted).  *See also Fike v. Ruger*, 752 A.2d 112, 114 (Del. 2000) ("[A] plaintiff is chargeable with such knowledge of a claim as he or she might have obtained upon inquiry, provided the facts already known to that plaintiff were such as to put the duty of inquiry upon a person of ordinary intelligence.").

[84] *See In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013); *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *5 (Del. Ch. Nov. 2, 2017), *aff'd*, 2019 WL 244619 (Del. Jan. 17, 2019).  While the court will give great weight to the *expiration* of the analogous statute of limitations when determining whether a claim is barred by laches, actions brought with unreasonable delay but within the statute of limitations may also be time barred in equity.  *Whittington*, 991 A.2d at 7–8.

[85] *Kraft,* 145 A.3d at 983.

[86] *See Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005) (noting a three-year limitations period applies to claims sounding in tort, contract, or breach of fiduciary duty when the harm alleged is not a personal injury); *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982) (noting Section 8106 applies to an action to impose a constructive trust); *Winklevoss Capital Fund, LLC v. Shaw*, 2019 WL 994534,

wrongful act, even if the plaintiff is ignorant of the cause of action."[87] "For a breach of contract claim, the wrongful act is the breach and the cause of action accrues at the time of the breach."[88] When plaintiff asserts promissory estoppel as an alternative to a breach of contract, the wrong occurs when the alleged "promise" is broken.[89] Finally, for claims sounding in tort, the cause of action accrues at the time of injury.[90]

Forman filed his first complaint on April 17, 2018. If his causes of action accrued before April 17, 2015, the Court may presume that he unreasonably delayed in bringing his claims.

A plaintiff may rebut the presumption of unreasonable delay by demonstrating the application of a recognized tolling doctrine or the presence of "unusual conditions or extraordinary circumstances."[91] Delaware courts recognize that the limitations period may be tolled in circumstances of (i) inherently unknowable

---

at *5 (Del. Ch. Mar. 1, 2019) (holding Section 8106 applies to claims sounding in fraud and promissory estoppel).

[87] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

[88] *Bean v. Fursa Capital P'rs, LP*, 2013 WL 755792, at *5 (Del. Ch. Feb. 28, 2013).

[89] *See Winklevoss*, 2019 WL 994534, at *5.

[90] *See Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992).

[91] *Kraft*, 145 A.3d at 983.

injuries, (ii) fraudulent concealment and (iii) equitable tolling.[92]  To show that a plaintiff's injuries were inherently unknowable, "there must have been no observable or objective factors to put a party on notice of an injury," and a plaintiff must plead facts demonstrating that he was "blamelessly ignorant" of the act and injury.[93]  "Fraudulent concealment 'requires an affirmative act of concealment by a defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.'"[94]  Lastly, equitable tolling will toll the limitations period "while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[95]  "Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discovery them."[96] While the defendant bears the burden of demonstrating the elements of laches, the

---

[92] *See Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005). *See also Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) ("Ignorance of the cause of action will not toll the statute, absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.").

[93] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d. 441 (Del. 1999).

[94] *Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007) (citing *Dean Witter*, 1998 WL 442456, at *4–6).

[95] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[96] *Dean Witter*, 1998 WL 442456, at *5.

plaintiff resisting the defense bears the burden of pleading facts sufficient to support the application of a tolling doctrine.[97]

In rare instances, a plaintiff may avoid the statute of limitations altogether when prosecuting equitable claims or seeking equitable remedies, even without tolling, upon showing that "unusual conditions or extraordinary circumstances" justify his delay.[98] Whether such conditions or circumstances are present cannot be determined by application of a hard and fast rule.[99] Instead, the trial court must exercise its discretion to determine if plaintiff's delay was the product of some condition or circumstance so compelling as to explain the failure within the bounds of vigilance. In this regard, our courts typically expect the plaintiff to demonstrate either that he was diligently and productively pursuing his rights before the statute of limitations expired or that he was precluded from doing so based on some unusual and unanticipated change in circumstances.[100]

---

[97] *Id*. ("As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

[98] *See IAC/InterActiveCorp*, 26 A.3d at 178.

[99] *Id*.

[100] *Id*. ("[F]actors that could bear on the analysis include: 1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; 2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; 3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; 4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and 5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim.").

In determining whether prejudice, the third element of a laches defense, exists, the court may presume prejudice to the defendant when the plaintiff has brought his claims after the expiration of the analogous limitations period.[101]  Moreover, "[t]he degree of prejudice required to invoke laches may reflect the length of the delay . . . . A particularly long delay in commencing an action and a relatively small amount of prejudice may support laches.  Likewise, a relatively short delay accompanied by more grievous or oppressive prejudice may also support laches."[102]

**C. The Founder's Shares Claims Are Barred by Laches**

All of Forman's claims related to the Founder's Shares rest on the premise that he was promised the shares in 2005, as memorialized in the letter agreement, and then relied upon Korpman's failure expressly to repudiate that agreement, as a fiduciary or otherwise, during the time leading up to the UHGI merger in 2017.  But the Amended Complaint tells a different story.  There, Forman alleges that, beginning in 2007, Korpman repeatedly indicated to Forman that the Company did not acknowledge his Founder's Shares.  On May 14, 2007, Korpman suggested that

---

*See also Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 772 (Del. 2013) (same); *Reid*, 970 A.2d at 184 (same).

[101] *See Sirius*, 2013 WL 5411268, at *4 ("After the statute of limitations has run, defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period.").

[102] Brill, *supra* note 1, at 38.

Forman's first tranche of 5,000 options, not the Founder's Shares, was the consideration given for Forman's early assistance with the Company. In July 2010, Forman requested information on how to transfer his "CentriHealth securities," and Korpman provided Forman with paperwork to transfer Forman's Series A and B Preferred stock only, not Founder's Shares. In February 2013, Forman again requested information regarding his ownership position, and Korpman told Forman he owned 32,500 Preferred A shares and 8,000 options. Again, Korpman made no mention of the Founder's Shares. Throughout this period, Forman was aware that he had requested share certificates from the Company as early as the end of July 2007 but never received them.

According to Forman, Korpman strung him along with respect to the Founder's Shares by promising to "make it good" in July 2007 and by maintaining a "cordial and non-adversarial" tone in the following years.[103] Because Korpman played the friendly, "bumbling administrator," Forman viewed the failure to recognize his Founder's Shares as a mistake that Korpman would eventually fix.[104] The trouble with Forman's argument is that the "mistake" remained uncorrected for more than 11 years before this lawsuit was filed; Forman knew well that the

[103] Pl.'s Opp'n Br. ("POB") (D.I. 18) 29.

[104] *Id.*

Company had not acknowledged his claimed ownership of Founder's Shares; and yet he did nothing press his claim. At least as of February 2013, when the Company confirmed yet again that Forman's Founder's Shares did not exist within the capital structure of the Company, Forman was obliged to file suit without unreasonable delay. Given that Forman sat in silence for another five years, it follows that Forman did not exercise that "degree of diligence which the situation . . . in fairness and justice requires."[105]

The so-called *O'Brien* factors do not help Forman.[106] He did not "pursu[e] his claim, through litigation or otherwise, before the statute of limitations expired," there were no proceedings in "another jurisdiction" that would justify the delay and he was not prevented from asserting his claim by a "material and unforeseeable change in [his] personal or financial circumstances."[107] Forman has not attempted to argue otherwise.

---

[105] *Baier*, 2018 WL 1791996, at *11 (citing *Scotton v. Wright*, 117 A. 131, 136 (Del. Ch. 1922), *aff'd sub nom. Wright v. Scotton*, 121 A. 69 (Del. 1923)). Needless to say, because Forman knew of his claims relating to the Founder's Shares at least more than five years before he sought to prosecute them, tolling in all of its forms does not apply here. *See Tyson Foods*, 919 A.2d at 584, 585–86 (noting the court may toll the statute of limitations only in instances "where it would be practically impossible for a plaintiff to discover the existence of a cause of action" and where "no objective or observable factors may exist that might have put the plaintiffs on notice of injury").

[106] *IAC/InterActiveCorp.*, 26 A.3d at 178.

[107] *Id.*

In his final thrust to save his markedly untimely claim, Forman argues he could not sue on the Company's failure to recognize his Founder's Shares until the 2017 UHGI merger because he did not suffer a cognizable harm before that moment. Specifically, he contends it was not until the consummation of the merger that the Company, under Korpman's direction, wrongfully converted his ownership interest in the shares leaving him only with a claim for damages.

Forman takes a far too narrow, and conveniently altered, view of his claims and of the wrong he alleges has been done to him. Inherent in the ownership interest of any asset, certainly stock, is the right to transfer or alienate that interest at the owner's election and to the owner's benefit.[108] The moment the Company, through Korpman, deprived Forman of the right to possess his interest in the Founder's Shares—in February 2013 at the latest—Forman suffered injury and his claims accrued. If Defendants converted Forman's ownership interest, it was long before the 2017 merger.[109]

As stated, prejudice to the defendant is presumed when a plaintiff brings his claims after the expiration of the analogous statutory limitations period. In this case,

---

[108] *See* 8 *Del. C.* § 159 ("The shares of stock in every corporation shall be deemed personal property and transferrable as provided in Article 8 of subtitle I of Title 6.").

[109] *See Albert*, 2005 WL 1594085, at *18 ("Whether or not the plaintiffs could have sued for damages is not dispositive as to whether the claim accrued, since as soon as the alleged wrongful act occurred, the plaintiffs could have sought injunctive relief [or specific performance].").

beyond *per se* prejudice, it is also reasonable to presume that Defendants would confront difficulties in securing relevant documents and perhaps witnesses who could assist in the defense of claims relating to events dating back to 2005. This is particularly so given that the Company merged with UHGI in 2017 with no reason to think that Forman would suddenly awaken from his slumber to assert long-stale claims.[110]

It is clear from the face of the Amended Complaint that Forman was on inquiry notice of Korpman's failure to recognize his Founder's Shares as of 2013 at the latest. Whether viewed as asserting a claim with unreasonable delay through the lens of the analogous statute of limitations or, more fundamentally, as a failure to act with vigilance when seeking equity, Forman's inexplicable delay in bringing his claims regarding the Founder's Shares cannot be countenanced. Counts I, III, VI, VII, VIII and IX, as related to the Founder's Shares, are barred by laches and dismissed.

### D. Plaintiff's Claims Premised on Defendants' Failure to Provide a Copy of the Option Plan Are Barred by Laches

Forman's breach of contract, promissory estoppel and breach of fiduciary duty claims as related to the Forman Options rest on the Company, Korpman and the

---

[110] *See Akrout*, 2018 WL 3361401, at *10 (finding prejudice to defendants who would have "difficulty securing relevant corporate records (if any still exist) and securing appropriate witness testimony (even assuming that memories are still intact)").

other Individual Defendants' alleged failure to provide him with a copy of the option plan.[111]   In this regard, Forman is correct that, under Section 157 of the Delaware General Corporation Law, the terms of the options and their duration "shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options" and "shall be stated . . . in a resolution of the board."[112]   Because no member of the Board delivered a copy of the option plan to him and did not set forth the terms of the options in the resolutions adopting the plan, Forman alleges the Individual Defendants breached the contract embodied in the option plan and their fiduciary duties to Forman as a stockholder.

Forman asserts these claims with little grace.  On February 12, 2006, Forman attended a Board meeting and voted to approve and adopt the option plan.  To the extent he now claims he did not (and does not) know the specifics of the option plan, that fact was known to him when he voted to approve the plan.  He also knew then that he did not possess a copy of the plan and could glean soon after that the Company had no intention of providing a copy of the plan to him.  According to Forman, Korpman told him in a May 2007 email exchange that the option plan was

---

[111] It is difficult to discern from the Amended Complaint what Forman claims to have been a breach of contract.  *See* FAC ¶¶ 61–65.  In his brief in opposition to the motion to dismiss, Forman clarifies that "Defendants are in prior material breach of the Option Plan by failing to disclose the Option Plan and by failing to deliver an Option Agreement."  *See* POB 56.

[112] 8 *Del. C.* § 157.

not memorialized in a writing. Forman's reading of this exchange is strained at best,[113] but even crediting Forman's interpretation, Korpman's email does nothing to justify Forman's delayed filing. If anything, it makes the laches defense even stronger. By Forman's lights, Korpman acknowledged that the Company had not complied with Section 157 as early as May 2007. But, again, vigilance eluded Forman.[114] He did nothing.

As the Amended Complaint makes clear, Forman could have sued Defendants for breach of contract and breach of fiduciary duty relating to the Forman Options as of May 2007, if not sooner. His delay in pursuing these claims eleven years later is presumed unreasonable by application of the analogous three-year statute of limitations. And, as with his Founder's Shares claims, Forman's unreasonable delay in prosecuting his claims relating to the failure to provide him with the option plan is presumptively prejudicial to Defendants. Beyond presumed prejudice, Defendants would confront actual prejudice in attempting to defend claims arising from events that date back to 2006.

---

[113] The May 2007 email exchange is a discussion about transferring share certificates during which Korpman stated: "Are you talking about the 5k options going to 10k options? OK, I thought you meant reassignment of the first round shares you bought to an affiliated entity. The option shares have no paperwork at the moment (they're just on the books of the company) . . . ." Ex. 12. This suggests Korpman was referring to certificates for the option shares, not the 2006 option plan.

[114] Plaintiff has also failed to address his own fiduciary duty as a director to be reasonably informed when making decisions on behalf of the corporation.

The Amended Complaint reveals that Forman knew as of 2006 that he did not have a copy of the option plan and had reason to believe, as of 2007, that a written version of the plan did not exist. His inexplicable delay in bringing his claims was unreasonable and Defendants were prejudiced as a result. Counts II, III, IV, V and VIII, to the extent they purport to state claims for failure to provide a copy of the option plan, are barred by laches.

### E. Forman's Claims Premised on Korpman's Misrepresentations Are Not Subject to Laches at the Pleadings Stage

Forman's remaining claims for common law and equitable fraud, breach of fiduciary duty and constructive trust/unjust enrichment rest on allegations that Korpman and McLean purposefully and knowingly concealed that Forman would forfeit his options upon resigning from the Board. Forman alleges that before he resigned, Korpman told him that his options would not terminate upon his resignation.[115] In reliance on this assurance, Forman resigned on August 31, 2010, without exercising his options.[116] As for McLean, Forman alleges that McLean knew Forman did not understand his rights under the option plan but did nothing to correct that misunderstanding.[117]

---

[115] FAC ¶ 40.

[116] *Id.*

[117] Forman makes no specific allegation against the other Individual Defendants. He simply alleges in conclusory fashion that, as fiduciaries, they were obliged to oversee the

32

Because Defendants maintain that Forman's resignation resulted in the forfeiture of the Forman Options, his claims arguably accrued when he resigned. But Forman has also well-pled that on September 13, 2010, less than two weeks after his resignation, Korpman told him that his first tranche of options had vested in February 2010, the second tranche would vest in August 2011, the options would expire ten years from issue and, accordingly, "[he had] six years left on one and seven on the other."[118] Korpman confirmed the existence (and validity) of Forman's 8,000 options again on February 14, 2013.[119] In May 2015, Forman sought information about exercising his options, but Korpman stated he was too busy to answer Forman's inquiry. Forman alleges it was not until July 2017, through a letter from Korpman's counsel, that he learned the Company was taking the position that his options expired upon his resignation in 2010. Taking these facts as true, it is reasonably conceivable that Forman did not have knowledge of his injuries or claims arising from the alleged misrepresentations until July 2017.

Defendants argue that Forman, a sophisticated investor experienced in owning and exercising options, acted unreasonably by failing to request a copy of the option

---

plan ad to communicate with Forman truthfully with respect to the plan. *See* FAC ¶ 69–70.

[118] FAC ¶ 43; Ex. 20.

[119] FAC ¶ 45; Ex. 21.

plan. Since Forman and Korpman were both directors and co-fiduciaries with equal access to information, and since Forman did not avail himself of all reasonably available information, Defendants say he is precluded from arguing a lack of knowledge or justifiable reliance upon Korpman's assurances that no forfeiture would occur if Forman resigned from the Board. These points may well carry the day—eventually. But the reasonableness of a plaintiff's reliance is a factual inquiry that is typically resolved with the benefit of discovery rather than at the pleadings stage.[120] There is no reason to depart from that preference here.

As the controlling stockholder and chairman of the Board, Korpman owed a fiduciary duty to Forman as a stockholder of the Company to act with honesty.[121] Forman has well-pled that Korpman failed to fulfill that duty. Whether and to what extent Forman's failure to inform himself of the terms of the CentriHealth stock option plan, either as a beneficiary of that plan or as a director who voted to approve the plan, will affect the viability of his claims, as a matter of laches or on the merits, are questions that must await further discovery to decide.[122]

---

[120] *See Vague v. Bank One Corp.*, 850 A.2d 303 (Del. 2004); *Wilm. Trust Co. v. Aetna Cas. & Sur.*, 690 A.2d 914, 916 (Del. 1996).

[121] *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998) ("[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.").

[122] *See Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989) (holding that, generally, "a party's failure to read a contract [cannot] justify its avoidance"); *Kaufman*, 603 A.2d at 835 (rejecting plaintiffs' argument of "blameless ignorance" due to

Forman has also raised a question of fact as to whether the option plan in place during his time on the Board actually stated that his options would terminate upon resignation. Specifically, he alleges that the version of the plan provided to him in 2017, which contains a footer dating the document "12/01/2015" and a document ID that includes "v2," "was created well after the grant" and possibly "modified in some unknown and undisclosed respect since its original iteration and after [Forman] resigned from the board."[123]

At this stage, I cannot say that Forman's reliance on Korpman's allegedly false assurances was unreasonable or that Forman could have relied on the 2006 option plan to answer his questions even if he had timely requested a copy of the plan. This is one of those instances where the fortune of the laches defense will depend on facts not yet developed.[124] Consequently, the motion to dismiss Counts IV, V, VI and VIII for laches, to the extent they state claims against the

---

reliance on insurance agency where insured had notice of and constructively accepted terms of the insurance policy); *Dean Witter*, 1998 WL 442456, at *8 (rejecting investors' tolling argument based on reliance on general partners and financial advisors as fiduciaries where investors could identify harms from the annual report).

[123] FAC ¶ 36; Ex. 17.

[124] *Perlman v. Vox Media, Inc.*, 2015 WL 5724838, at *13 (Del. Ch. Sept. 30, 2015) (denying motion to dismiss upon concluding that defendants had failed to "convince" the court "that there are no reasonably conceivable circumstances under which Plaintiffs could overcome Defendants' laches defense").

Individual Defendants for false representations with regard to the Forman Options, must be denied.

## F. Plaintiff Has Adequately Pled Claims for Fraud and Unjust Enrichment/Constructive Trust

Having decided that Plaintiff's claims arising from alleged misrepresentations regarding the Forman Options are not barred by laches at this stage, I turn to the merits of those claims.[125] As stated, the aspects of these claims that are not barred by laches accuse Korpman and McLean of purposefully concealing that Forman forfeited his options upon resigning from the Board. For a common law fraud claim to survive a motion to dismiss, Plaintiff must allege:

> (1) that a defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation.[126]

---

[125] As best I can read the motion to dismiss, Defendants have not addressed the merits of Plaintiff's claim for breach of fiduciary duty as to Korpman (Count V). Even if Defendants were moving to dismiss that claim, I am satisfied that Plaintiff has pled a fiduciary relationship between Korpman and Forman, a duty of candor owed to Forman and that Korpman misled Forman with respect to whether the options would survive Forman's resignation. I address the surviving breach of fiduciary duty claims against the other Individual Defendants below.

[126] *Grunstein v. Silva*, 2009 WL 4698541, at *12 (Del. Ch. Dec. 8, 2009).

Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[127] This means the circumstances of the fraud must be alleged "with detail sufficient to apprise the defendant of the basis for the claim," which typically requires plaintiff to plead "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representation."[128] On the other hand, "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[129] "This means a plaintiff need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false."[130]

"The elements of equitable fraud are similar to those for common law fraud, except that the claimant need not show that the respondent acted knowingly or recklessly—innocent or negligent misrepresentations or omissions suffice."[131] A claim for equitable fraud, however, requires the plaintiff to well-plead: "(1) a special relationship between the parties or other special equities, such as some

---

[127] Ch. Ct. R. 9(b).

[128] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[129] Ch. Ct. R. 9(b).

[130] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).

[131] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (internal quotation omitted).

form of fiduciary relationship; or (2) a justification for a remedy that only equity can afford."[132] Generally, where a fiduciary relationship has been well-pled, what amounts to common law fraud will also amount to equitable fraud.[133]

Viewing the facts alleged in favor of Forman, I am satisfied he has fulfilled his pleading burden under Rule 9(b). He has alleged the specifics (as to who, when and where) of several representations made by Korpman that Defendants now disavow as inconsistent with the 2006 option plan.[134] He has also alleged justifiable reliance in that he refrained from exercising the Forman Options in reliance upon Korpman's assurances. It is also alleged that, upon forfeiture, Defendants' holdings were no longer diluted by the options allegedly once held by Forman, thus providing some gain to the Individual Defendants as a result of the false representations.[135] Since conditions of the mind may be averred generally and Forman's reasonable reliance upon Korpman's specifically-identified assurances has been well-pled, Forman has adequately pled a claim for common law fraud against Korpman.

---

[132] *Id.*

[133] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 143 (Del. Ch. 2009) (citing 3 JOHN NORTON POMEROY, POMEROY'S EQUITY JURISPRUDENCE § 872 (5th ed. 2002)); *Reid*, 970 A.2d at 182.

[134] FAC ¶¶ 40, 43, 45; Exs. 20, 21.

[135] FAC ¶ 73.

As previously noted, Forman has well-pled that a special relationship existed between Korpman, as controlling stockholder and chairman of the Board, and Forman, as a stockholder of the Company. Accordingly, Forman's claim for equitable fraud against Korpman survives subject to a later finding that it is duplicative of Forman's common law fraud claim.[136] The motion to dismiss is, therefore, denied as to Counts IV, VI and VIII with respect to Korpman.[137]

## G. Forman Has Failed to State Viable Claims Against McLean and the Other Members of the Board

Forman has also asserted his common law fraud claim against McLean and breach of fiduciary duty claims against McLean and other members of the Board. The claims against McLean rest on the thin reed that when Forman directed his inquiries regarding the Forman Options to McLean, McLean promised to inquire

---

[136] If Forman is attempting to plead negligent misrepresentation under a label of equitable fraud, it is possible the equitable fraud claim will stand apart from his common law fraud claim.

[137] I note that Defendants seek dismissal of Count VI (constructive trust) on the ground that a constructive trust is a remedy, not a standalone claim. That is true, but that, alone, is not a basis to deny Forman the remedy of constructive trust should he prevail on his claims against Korpman relating to the Forman Options. *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 262 (Del. 2017) (reversing the trial court for dismissing standalone claims for reformation and rescission upon concluding that the determination of whether these equitable remedies are available must await the adjudication of the underlying claims); *Envo, Inc. v. Walters*, 2009 WL 5173807, at *8 (Del. Ch. Dec. 30, 2009) (noting that profits from an acquisition may be reachable through a constructive trust though they are in the possession of an entity that was not a party to any of the agreements at issue in the action and may not have participated in any wrongdoing).

39

and "[k]eep [Forman] up to date," but then went silent.[138]  Of course, there is no allegation that McLean, as Board member, had any more access to information than Forman, as Board member, enjoyed, much less that McLean (or any other Board member) intentionally suppressed information or provided Forman with false or misleading information.  Nor is the conclusory allegation of a "failure to oversee" the option plan well-pled.[139]  Counts IV, V, VI and VIII against McLean and the other Board members must be dismissed.

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED as to Counts I, II, III, VII and IX.  The motion is GRANTED in part (with respect to McLean and other members of the Board) and DENIED in part (with respect to Korpman) as to

---

[138] Ex. 23; FAC ¶ 46 ("Mr. McLean was aware that both he and Mr. Forman owned the same unexercised options and said that he would provide Mr. Forman with an answer, but he too, never responded."); FAC ¶ 67 ("In a series of communications with Dr. Korpman and Mr. McLean, they purposefully and knowingly concealed the facts surrounding the Forman Options.").

[139] The sum and substance of Forman's allegations against the other Board members (setting aside the allegation that the Board members had a duty properly to administer the option plan), is that the Board members owed Forman the same duty of candor as Korpman and McLean owed.  *See* FAC ¶ 69 ("The other members of the Board named as defendants owed those same duties [of candor as Korpman] . . . ."); FAC ¶ 70 ("The other members of the board had this same duty [to speak and to speak candidly].").  There is, however, no well-pled allegation that the other Board members breached that duty.

Counts IV, V and VIII.  The motion is DENIED as to Count VI to the extent the constructive trust relates to the Forman Options.

**IT IS SO ORDERED.**